Heber Scowcroft Investment Company, et al. [1] v. Commissioner. Heber Scowcroft Inv. Co. v. Commissioner
Docket Nos. 5393, 5394, 5395, 5396, 5397, 5398, 5399, 5400, 5401, 5402, 5403.
United States Tax Court
1945 Tax Ct. Memo LEXIS 140; 4 T.C.M. (CCH) 755; T.C.M. (RIA) 45235; June 28, 1945
*140 Taxpayers were stockholders in a corporation which had originally been engaged in the wholesaling and jobbing of groceries and dry goods. Prior to 1920, the corporation expanded and began the manufacture of clothing and the operation of retail stores. The corporation's surplus was invested in permanent assets in connection with these activities, and in 1920 these invested earnings were capitalized and a stock dividend issued. In 1939, because of losses sustained in their operation, these departments, along with a canning department which had been added subsequent to 1920, were liquidated, and on November 30, 1939, 30 per cent of the corporation's outstanding stock was retired and cancelled. The value of the stock retired represented the amount which it was estimated would be realized upon liquidation of the unprofitable departments. Held, the cancellation and redemption of stock on November 30, 1939, was not made at such a time and in such a manner as to be essentially equivalent to a taxable dividend within the meaning of section 115(g), I.R.C.
A Calder Mackay, Esq., 728 Pacific Mutual Bldg., Los Angeles, Calif., and Lincoln G. Kelly, Esq., 608-12 Walker Bank Bldg., Salt Lake City, Utah, for the petitioners. E. A. Tonjes, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in income tax, personal holding company surtax and delinquency penalties for the year 1939, as follows: Personal
Income
Holding Co.
Docket No.
Petitioner
tax
surtax
Penalty
5393
Heber Scowcroft Investment Co.
$2,678.24
$32,893.89
$8,223.47
5394
J. Fletcher Scowcroft
4,607.93
5395
Dorothy S. Rich
3,094.89
5396
Ida H. Scowcroft
39.32
5397
John W. Scowcroft
240.43
5398
Lucille B. Scowcroft
37.80
5399
Albert Scowcroft, Jr.
1,208.13
5400
Vern Allen
17.32
4.33
5401
June S. Swaner
3,419.06
5402
Mary S. Peery
3,515.23
5403
Virginia S. Pugmire
2,594.92
*142 The single issue in controversy, common to all the petitioners, is whether or not a distribution in cancellation and retirement of stock made by John Scowcroft & Sons Company on November 30, 1939, was made at such a time and in such a manner as to make the distribution essentially equivalent to a taxable dividend within the meaning of section 115 (g) of the Internal Revenue Code. Certain minor adjustments in Docket Nos. 5394, 5395, 5400, 5401, 5402 and 5403, are not contested. In his brief the respondent concedes that there is no liability in Docket Nos. 5393 and 5400 for any penalties due to failure to file returns within the time required by law. Findings of Fact The petitioner, Heber Scowcroft Investment Company, is a corporation organized and existing under and by virtue of the laws of Utah, with its principal place of business in Ogden, Utah. The other petitioners are individuals, all of whom reside in Ogden, Utah, except the petitioner, June S. Swaner, who resides in Salt Lake City, Utah. The returns were filed with the collector of internal revenue for the district of Utah. Each petitioner was the owner on November 30, 1939, of shares of stock *143 of John Scowcroft & Sons Company. In addition, each of the petitioners in Docket Nos. 5395, 5401, 5402 and 5403 was the income beneficiary of trusts bearing their respective names, which trusts also owned shares of stock of John Scowcroft & Sons Company on November 30, 1939. On that date the petitioners and the trusts surrendered to the company for cancellation and retirement 30 per cent of the shares held by each of them and received in exchange therefor the sum of $60 per share. The petitioners and the trusts treated the transaction as a partial liquidation giving rise to capital gain or loss. The respondent determined that the cancellation or redemption of stock was essentially equivalent to the distribution of a taxable dividend and has included as ordinary income the full amount received by each petitioner, including in the case of the trust beneficiaries, the full amount received by the respective trusts. John Scowcroft & Sons Company, hereinafter called the company, was organized on February 1, 1893. It was authorized by its articles of incorporation to engage in a general merchandise and manufacturing business, including the buying and selling and manufacture of all kinds *144 of merchandise. The original capital of the company consisted of 1,250 shares of stock, all of one class, with a par value of $100 per share, or an aggregate of $125,000. All of the shares were subscribed for and issued to the incorporators at the time of organization. From 1893 until 1912, the company was engaged as a wholesaler and jobber of merchandise consisting primarily of dry goods and groceries. During this period the volume of business gradually increased. It did not engage in manufacturing during these years. Beginning in 1912 the company began manufacturing overalls, pants, underwear and dresses. From then until 1920 the company carried on this manufacturing in addition to its wholesaling and jobbing business. The volume of business expanded rapidly. Gross sales increased from $1,258,705.58 in 1913 to $7,280,238.13 in 1920. The gross sales of overall and dress goods manufactured by the company, which are included in the foregoing figures, increased each year from $199,366.30 in 1913 to $509,617.21 in 1920. In 1919 the company branched out into Idaho Falls, Utah, and built a warehouse in Price, Utah, as a branch of its wholesale grocery business. As an additional outlet *145 for its products, it financed and operated a number of retail stores in Utah and Idaho. The Company extended credit on a long-term basis and its accounts receivable increased from $618,045.99 in 1913 to $1,347,258.19 in 1920. Inventories at the end of 1919 amounted to $1,188,767.38. In 1906 the company distributed a stock dividend of 6,600 shares. The capital stock outstanding account at March 1, 1913 was $830,300. From 1908 through 1912 the net income of the company aggregated $385,452.19.Cash dividends paid during the same period totaled $402,218.51. The company had earnings accumulated prior to March 1, 1913 in the amount of $358,256.86. The company's balance sheet as of December 31, 1919, disclosed total assets of $3,116,743.92, consisting primarily of accounts and notes receivable of $1,255,194.01; inventories of $1,188,767.38; securities of $213,833.47; and fixed assets (less depreciation reserve) of $166,289.31. Current liabilities totaled $1,215,218.94, the principal item of which consisted of notes payable amounting to $817,100. Its surplus was $1,077,724.98 and capital stock, $823,800. A special meeting of the stockholders of the company was held on March 27, 1920, at *146 which were unanimously adopted a resolution increasing the authorized capital from $1,000,000 to $2,500,000, consisting of 25,000 shares of $100 par value each, amending the articles of incorporation to provide for such increase and a resolution authorizing the distribution of a stock dividend of 1 1/2 shares of stock for each share outstanding, a total of 12,357 shares. The latter resolution recited in part as follows: "Whereas there has been expended for permanent improvements and betterments, including machinery, equipment and real estate, and other fixed assets, during the years 1906 to 1919, both inclusive, more than $1,235,700.00, all of which has been furnished from the net earnings of the company, and has been carried on the books of the company as invested surplus and fairly belongs to the stockholders of this company; and "Whereas, the company requires in its business the use of said invested surplus, in addition to its paid-up capital, and will continue to so require the use of said money in the transaction of its business and in the continuation thereof;" * * * * *
The earned surplus account of the company stood at $18,617.41 after the above-mentioned distribution. *147 The company added a canning business to its operations in 1926. It acquired a canning factory, purchased machinery and equipment, and entered into contracts with farmers for the purchase of vegetables and fruits which it canned and sold in its territory. Business of the company as a whole continued good from 1921 through 1930. The profits on the sale of overalls and dress goods declined from 1924 to 1929 and a net loss in this department was sustained in 1930. The net earnings of the entire company, however, remained fairly constant from 1921 to 1930, aggregating $1,219,762.08. Some time between 1920 and 1930, the company changed its credit policy, reducing its terms to weekly, 15-day, or at the most 30-day terms. As a result, accounts receivable were reduced from $1,347,258.19 in 1920 to $548,989.76 in 1930, and a substantial amount of capital was released, which theretofore had been required to carry the excessive accounts receivable. The directors believed that the capital which had thus been released would no longer be needed in the business. It was, therefore, determined to retire 25 per cent of the outstanding stock. This was done in 1931, reducing the outstanding shares *148 by 5,024 shares. The shares were redeemed pro rata at the price of $60 per share, a total of $301,440. For several years after 1931, the company suffered severe competition from chain stores in its principal business, that of an independent wholesale grocer. The competition was also felt in the company's manufacturing department, which began to show net losses. Losses from the overall and dress goods manufacturing department were sustained in the years 1931 and 1932 and the years 1935 to 1939, inclusive. The canning business was also adversely affected. Canned goods were being sold in the territory cheaper than they could be packed. The company as a whole sustained losses in 1931, 1932 and 1939. In an effort to meet competition, the company in 1932 organized a company known as General Department Stores, as a retail outlet for its manufactured goods. By the end of 1938 the company had sustained losses of approximately $130,000 in this venture. Because of the difficulties encountered and the losses sustained in the manufacturing and canning branches of the business, as well as in the retail field, in 1939 it was decided to abandon and liquidate those departments and to return to *149 the original business of the company, the wholesaling and jobbing of groceries and dry goods in which the company had always been most successful. A meeting of the board of directors was held on September 26, 1939, the minutes of which read, in part, as follows: "J. Fletcher Scowcroft [the company's president] brought up the subject of the firm discontinuing certain departments. He explained that certain departments were and had been losing money for several years and others were taking too much capital for the benefits they were able to produce. The overall and dress and underwear factories have not proved profitable for several years and the canning factory had entailed the use of large amounts of capital to pack a year's supply of canned goods and that at times so much was packed in a season that it could not all be disposed of in a whole year. The factories had to carry large stocks of raw material; also tied up considerable capital in machinery and equipment. It was thought that this merchandise could all be bought from other sources in small quantities with frequent replacements on a great deal less capital. "It was estimated that from 200 to $250,000.00 could be taken *150 out of these departments in machinery, equipment and merchandise if they were liquidated." The board called a special meeting of the stockholders which was held on October 19, 1939, and at which a resolution was adopted authorizing a decrease in capital stock and a partial retirement of outstanding shares. The company amended its articles of incorporation, reduced its capitalization and retired and canceled 30 per cent of its outstanding stock. The retirement was at the rate of $600 per share, a total of $213,360 for 3,556 shares retired. There had been considerable buying and selling of the stock between stockholders during 1939 at $60 to $61 per share and in arriving at the determination of how many shares should be retired and canceled the company divided the amount which it estimated would be recovered from the liquidation of the unprofitable departments by $60, regarded as the fair market value of each share of stock. The stock was actually canceled and retired and the application for reduction of capital stock was filed with, and granted by, the State of Utah. The retail business of the company was liquidated and abandoned in 1939. The manufacturing and canning machinery *151 was sold for approximately $25,000. In 1939 and 1940 the canned goods inventory was reduced from $170,000 to $10,000, which was considered a normal figure. The raw materials inventory of approximately $35,000 was likewise liquidated and turned into cash. Since 1939 the company had not engaged in either manufacturing or canning. In 1939 the company paid salaries to its president, to its general manager and vice president, to another vice president in charge of the dry goods department and to its secretary of $7,500 each. These individuals constituted all the executive officers. The gross sales and net earnings of the company and the cash distributions for the years 1913 to 1939, inclusive, are as follows: Year
Gross Sales
Earnings
Cash Distributions
1913
$1,258,705.58
1913-3/1/-12/31
$ 137,077.95
$ 83,029.60
1914
2,404,612.96
116,727.20
82,916.28
1915
2,490,348.81
164,414.64
82,779.68
1916
2,830,115.24
334,447.92
124,169.68
1917
3,565,061.58
251,952.75
107,460.36
1918
3,756,765.65
165,911.87
107,088.64
1919
5,475,914.18
292,825.73
148,289.00
1920
7,280,238.13
167,354.23
158,918.50
1921
4,719,426.93
112,988.01
123,422.00
1922
4,214,621.43
127,851.73
117,254.25
1923
4,456,658.98
167,023.52
142,401.00
1924
4,028,826.19
92,506.88
121,553.50
1925
4,146,255.95
147,623.25
120,969.75
1926
4,020,463.32
124,042.13
120,925.00
1927
4,140,294.75
124,135.17
120,876.00
1928
4,425,752.14
160,543.86
120,840.00
1929
4,347,469.15
165,471.45
120,702.00
1930
3,620,401.56
105,076.08
120,576.00
1931
2,816,223.25
(15,909.17)
47,680.18
1932
2,180,492.57
(49,340.63)
12,486.68
1933
2,631,785.97
68,033.17
1934
3,261,490.15
95,175.77
35,763.00
1935
3,247,261.79
59,453.30
35,759.50
1936
3,662,012.25
76,231.78
62,328.00
1937
4,011,947.15
57,072.97
53,348.00
1938
4,000,022.36
18,104.72
14,816.25
1939
4,261,392.20
(12,112.98)
20,150.00
$3,254,683.30
$2,406,502.85
*152 The company's gross sales, net income and dividends paid for the years 1940 to 1942, inclusive, are as follows: Gross Merchandise
Year
sales
Net Income
Dividends paid
1940
$4,565,668.35
$ 99,772.99
$ 41,485.00
1941
5,191,186.65
109,028.62
49,782.00
1942
6,029,927.63
102,280.84
66,376.00
The concellation and redemption of stock on November 30, 1939, was not made at such a time and in such a manner as to be essentially equivalent to a taxable dividend. Opinion VAN FOSSAN, Judge: The question here in issue is whether the redemption and cancellation of stock of John Scowcroft & Sons Company on November 30, 1939, was made at such a time and in such a manner as to make the distribution essentially equivalent to a taxable dividend within the scope of section 115 (g)of the Internal Revenue Code. The petitioners contend that the distribution was not essentially equivalent to a taxable dividend but was a true partial liquidating dividend within the meaning of sections 115 (c) and 115 (i) of the Code. The pertinent statutory provisions are all noted in the margin. [2]
*153 The question presented has been considered in numerous decisions of this and other Courts. We shall not attempt a detailed analysis of the authorities since we have consistently held that each case of this type must stand upon its own particular facts. No definite rule of construction has been laid down by which to determine all cases. William H. Grimditch, 37 B.T.A. 402. Certain tests or criteria, however, have been suggested in the cases as aids in reaching a conclusion on the problem. The court observed in Commissioner v. Cordingley, 78 Fed. (2d) 118: * * * it is the settled view of the Board of Tax Appeals that sums paid in retirement of stock were not taxable as dividends, unless the retirement was made in pursuance of a plan formed at the time when the stock was originally issued, or as a cloak for the distribution of earnings. * * * Another test is whether the redemption was dictated by the reasonable needs of the business or originated with or was designed for the benefit of the stockholders who received its fruits. A. E. Levit, 43 B.T.A. 1077. An examination of the facts in the instant case reveals no indication that the issuance *154 of the stock dividend by the company in 1920 was in any way part of a plan to distribute corporate earnings in a manner which would prevent their taxation as ordinary dividends in the hands of the stockholders. The evidence shows that in the years prior to 1920 the business had expanded rapidly and had branched out into new lines of activity; that the surplus had been invested in permanent assets connected with these activities; and that this surplus had been capitalized in order more clearly to reflect the company's true condition. The distribution of the stock dividend was in accordance with the company's purpose to expand its business along legitimate lines. It does not follow, however, merely because the stock dividend in 1920 was issued in good faith that the distribution in redemption and cancellation of stock in 1939 was not equivalent to a taxable dividend. Section 115 (g) will be held to apply if the retirement was made as a cloak for the distribution of earnings. See Commissioner v. Cordingley, supra.We must, therefore, scrutinize the redemption and distribution with respect to the time and manner when they occur and the circumstances surrounding them at *155 the time. See Annie Watts Hill, 27 B.T.A. 73, affirmed, 66 Fed. (2d) 45. Such a scrutiny sufficiently shows, we think, that the redemption and cancellation of the stock in 1939 was founded upon a sound and genuine business purpose. In 1930 the company's manufacturing departments, which had been profitable up to that time, began to lose money. Competition from chain stores was severe. The canning activities were likewise adversely affected, canned goods being sold in the company's territory more cheaply than they could be produced. Losses were sustained also in the retail sales branch of the company. Although the company as a whole realized profits in all years prior to 1939, except 1932 and 1933, that profit was substantially reduced in 1930 and subsequent years because of the losses in the manufacturing, canning and retail departments. As a result, the directors of the company in 1939 determined to liquidate the unprofitable departments of the business and to redeem and retire a proportionate amount of the company's capital stock. The amount of stock which was to be retired was determined by dividing the fair market value of a share of stock into the *156 amount which it was estimated would be realized upon the liquidation of these assets. Upon the record thus presented, we cannot conclude that the redemption of the stock was a mere cloak for the distribution of earnings or that the time and manner of the distribution made it essentially equivalent to the distribution of a taxable dividend. So far as the evidence shows, the directors were prompted in their action solely by the needs of the business. There is no hint or suggestion that the retirement of the stock was instigated by the stockholders for their personal benefit. See A. E. Levit, supra.In fact, the record negatives such an inference. We are further impressed by the long record of substantial cash dividend distributions made by the company. Such action is indicative of a lack of any purpose on the part of the petitioners and their company to distribute corporate earnings by means of an artifice to escape taxation. See T. Pierre Champion, 27 B.T.A. 1312. We shall briefly advert to some of the respondent's contentions. He concedes that "the parties who carried out the transactions" had no intent to make a distribution of a taxable dividend and *157 that no bad faith attaches to the distribution. He contends, however, that the "net effect" of the transaction was to make a distribution of earnings and profits essentially equivalent to the distribution of a taxable dividend. See Flanagan v. Helvering, 116 Fed. (2d) 937. In support of his contention the respondent points to the asserted fact that the company had earnings and profits accumulated since March 1, 1913, in excess of the amounts distributed on November 30, 1939. Such a fact, however, is not controlling. As was pointed out in Commissioner v. Brown, 69 Fed. (2d) 602, section 115 (g) does not turn every partial liquidation into a dividend whenever there are undistributed earnings in the corporation. It is the time and manner of the liquidation, not the existence of undistributed earnings, which makes the distribution essentially equivalent to a taxable dividend. The respondent also contends that there was no actual curtailment of the company's business. This is contrary to the evidence which shows unquestionably that the assets used in the manufacturing, canning and retail departments were actually sold and disposed of. The respondent emphasizes *158 the fact that the gross sales of the company increased in the years 1935 to 1939. However, it also appears that the net profits decreased over the same period; that the decrease was a result of the losses sustained in the departments liquidated in 1939; and that this was the primary reason for their liquidation. It is the respondent's further contention that the retirement and distribution served no reasonable purpose of the company's business. We are of the opinion that the transaction was motivated by sound business reasons. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: J. Fletcher Scowcroft; Dorothy S. Rich; Ida H. Scowcroft; John W. Scowcroft; Lucille B. Scowcroft; Albert Scowcroft, Jr.; Vern Allen; June S. Swaner; Mary S. Peery; and Virginia S. Pugmire.↩
2. SEC. 115. DISTRIBUTION BY CORPORATIONS. * * * * *
(c) Distributions in Liquidation. - Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. Desipte the provisions of section 117, the gain so recognized shall be considered as a short-term capital gain * * *. In the case of amounts distributed (whether before January 1, 1939, or on or after such date) in partial liquidation * * * the part of such distribution which is properly chargeable to capital account shall not be considered a distribution of earnings or profits. * * * * *
(g) Redemption of Stock. - If a corporation cancels or redeems its stock (whether or not such stock was issued as a stock dividend) at such time and in such manner as to make the distribution and cancellation or redemption in wholeo r in part essentially equivalent to the distribution of a taxable dividend, the amount so distributed in redemption or cancellation of the stock, to the extent that it represents a distribution of earnings or profits accumulated after February 28, 1913, shall be treated as a taxable dividend. * * * * *
(i) Definition of Partial Liquidation. - As used in this section the term "amounts distributed in partial liquidation" means a distribution by a corporation in complete cancellation or redemption of a part of its stock, or one of a series of distributions in complete cancellation or redemption of all or a portion of its stock.↩